### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

BOWLING CENTERS ASSOCIATION OF
MICHIGAN; FOREST VIEW LANES, LLC;
SLIM'S REC, INC. d/b/a SPARTAN WEST
BOWLING CENTER; MR. K ENTERPRISES,
INC. d/b/a ROYAL SCOT GOLF & BOWL;          Case No.
R2M LLC d/b/a SPECTRUM LANES; and
AND-GLO ENTERTAINMENT, LLC d/b/a            Hon.
MERRI BOWL LANES,

               Plaintiffs,

vs.

GRETCHEN WHITMER, in her official capacity
as Governor, and DANA NESSEL, in her official
capacity as Attorney General,

               Defendants.

_____

### <u>VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

The Bowling Centers Association of Michigan, Forest View Lanes, LLC, Slim's Rec, Inc.,

d/b/a Spartan West Bowling Center; Mr. K Enterprises, Inc. d/b/a Royal Scot Golf & Bowl, R2M,

LLC d/b/a Spectrum Lanes, and And-Glo Entertainment, LLC d/b/a Merri Bowl Lanes (collectively,

"Plaintiffs"), bring this lawsuit to vindicate their rights under the United States and Michigan

Constitutions to permit on-premises recreational bowling notwithstanding Executive Order 2020-

160 (***Exhibit 1***).  Plaintiffs bring this Complaint for declaratory and emergency injunctive relief

against Defendant Gretchen Whitmer, in her official capacity as Governor, and Dana Nessel, in her

official capacity as Attorney General, and allege as follows:

1

## INTRODUCTION

1.      Amid the COVID-19 global health pandemic and resulting economic uncertainty, Governor Whitmer has issued a series of executive orders that, in the name of protecting public health and safety, impose material restrictions on private business activities including prohibiting recreational bowling at bowling centers across the state. While Plaintiffs agree with the need to protect public health and safety, the Governor's actions through Executive Order 2020-160 do not accomplish that goal as applied to Plaintiffs.

2.      The ostensible purpose of the Governor's restrictions-on-business orders is to prevent person-to-person contact and spread of COVID-19. But the threat or likelihood of such contact and spread does not depend on whether a business activity is deemed by the government to be essential or non-essential. Rather, that threat depends on the mitigating health and safety measures implemented and adhered to by operating businesses.

3.      Plaintiffs are materially adversely affected by Executive Orders 2020-160.

4.      Under threat of criminal penalties, they have been forced to close or materially restrict their business activities in violation of their constitutional rights. At the same time, the Governor has permitted and continues to permit some "non-essential" business activities provided those business owners adhere to health and safety guidance, principally from the United States Center for Disease Control and Prevention (the "CDC"). Plaintiffs are fully willing and capable of adhering to CDC and other reasonable health and safety guidance, and have so notified the Governor.

5.      The Bowling Centers Association of Michigan, in conjunction with the national Bowling Proprietors' Association of America, prepared, published, and weeks ago provided to Governor Whitmer the "**Bowling Center Guidance for Re-Opening and Continued Operation**"

2

35410459.8

which is a step-by-step guide to bowling centers' reintegration in Michigan (*Exhibit 2*).  The document incorporates health and safety guidance and resources from the CDC, Occupational Safety and Health Administration ("OSHA"), together with state protocols.  Plaintiffs must be afforded the opportunity to implement these comprehensive measures and reopen for business before it is too late.

6.      With implementation of these health and safety measures, there is nominal if any public health benefit from Executive Order 2020-160.  Recreational bowling can be done safely.  In fact, despite COVID-19 concerns, recreational bowling utilizing proper health and safety measures is permitted in 45 states – only Michigan, New York, North Carolina, California and Washington (state) currently prohibit recreational bowling.

7.       Recreational bowling is a healthy physical activity.  The benefits include reduced risk of diseases caused by a sedentary lifestyle, including cardiovascular conditions, diabetes, and other related conditions.

8.      Accordingly, Plaintiffs seek an emergency preliminary injunction that allows them to immediately resume recreational bowling.  They also seek a permanent injunction protecting these interests, together with costs and actual attorney fees.

## PARTIES

9.      Bowling Centers Association of Michigan ("BCAM") is the state's largest bowling trade association, representing 165 bowling centers across the state.  Founded in 1945, the BCAM's mission is to protect, promote, foster, and advance the interests of its members in their respective business of operating bowling centers.

10.     Forest View Lanes, LLC ("Forest View"), a Michigan limited liability company, is located in Temperance, Michigan just over two miles north of the Ohio border.  Forest View has

been operating since 1962, and the current owner, Rich Kenny grew up working at the center. Since March 16, 2020, Forest View has lost more than $1 million in revenue. Forest View has approximately 700 league bowlers, but all of those bowlers will be lost to bowling centers in Ohio for the season (which runs through April 2021) – and likely beyond – if Forest View is not open in August. Ohio has four bowling centers within seven miles of Forest View, all of which are open. Forest View cannot survive such a catastrophic loss of its core business. Mr. Kenny has spent more than $30,000 on COVID-19 related safety measures, including masks, cleaning supplies, hand sanitizer at every lane and table, one-time-use souvenir stylus pens for the touch screens, dividers between all lanes, contactless payment, and protocols to sanitize balls and shoes with both cleaning products and ultraviolet light.

11.     Slim's Rec Inc., d/b/a Spartan West Bowling Center ("Spartan West"), a Michigan corporation, is a 16-lane bowling center located in Ludington, Michigan. Owner Donn Slimmen has been operating it since the early 1980s and has taken the center through ups and downs, including a Christmas Day roof collapse in 1989 that required a total rebuild. Spartan West has had no revenue from mid-March through mid-June 2020 and has lost all of its summer leagues. The center's restaurant and bar do not generate enough revenue to sustain the business and it cannot survive the loss of the nearly 200 weekly bowlers that usually participate in its fall leagues.

12.     Mr. K Enterprises, Inc., d/b/a Royal Scot Golf & Bowl ("Royal Scot"), is a Michigan corporation located in Lansing, Michigan that has been owned by the Kweicien family for 36 years. The 60-lane facility is one of the state's top rated tournament venues and – in spite of its summer golf course revenue and new efforts to serve food outdoors with a curbside grill – the business will not survive if its fall league bowlers are not permitted to start the season. Royal Scot has every health and safety procedure already in place to make sure bowlers can enjoy the

4

sport while complying with social distancing requirements, and in addition to its rigorous cleaning and sanitizing procedures, it plans to keep bowlers separated from others by leaving every other lane empty and scheduling bowlers by appointment.

13.     R2M, LLC d/b/a Spectrum Lanes ("Spectrum Lanes"), a Michigan limited liability company located in Wyoming, Michigan, has been owned by the Eaton family for almost 40 years. The family recently completed a $6 million renovation project on the 52-lane bowling center—12 of those lanes are part of a new private boutique bowling experience—just days before the virus hit. While Spectrum Lanes has a restaurant, it does nowhere near enough business to sustain the bowling center. After several months with no revenue, Spectrum Lanes is struggling to pay on its renovation loans. If the bowling center does not reopen by fall, the business will not survive.

14.     And-Glo Entertainment LLC d/b/a Merri Bowl ("Merri Bowl"), a Michigan limited liability company, is a 40-lane state-of-the-art bowling center located in Livonia, Michigan that has operated since 1959. Merri Bowl has 2200 league bowlers and 42 leagues. It employs special needs high school students and has programs for high school and collegiate bowling. Merri Bowl's next league is scheduled to begin on August 21, 2020. Like the other bowling centers, Merri Bowl lost all of its revenue from mid-March – mid-June and will not be able to sustain its business if the prohibition on bowling continues. To provide a safe, socially distanced bowling experience, Merri Bowl has installed a bi-polar ionization plasma filtration system and UV-C light purification in its heating and cooling system. The system continuously circulates the air to kill nearly 100% of all mold, bacteria, and viruses. In addition, Merri Bowl installed multiple sanitizing stations, rigorous cleaning procedures, and social distancing measures throughout its facility. While Merri Bowl has thorough procedures for sanitizing house balls and shoes, it also has "bowling buddies" available, which are single-use slip covers to put over street shoes.

5

35410459.8

15.     Defendant Gretchen Whitmer is the Michigan Governor and is being sued in her official capacity.  Defendant Whitmer is, and at all relevant times was, an employee of the State of Michigan vested by the Michigan Constitution with the executive power of the State, including the power to supervise each of the principal departments of the executive branch of the State government.  Governor Whitmer issued Executive Order 2020-160.

16.     Defendant Dana Nessel is the Attorney General of the State of Michigan and is being sued in her official capacity.  Defendant Nessel is, and at all relevant times was, an employee of the State of Michigan with authority to enforce Michigan law.

## JURISDICTION AND VENUE

17.     Plaintiffs seek declaratory and injunctive relief preventing enforcement of Executive Order 2020-160 against Plaintiffs and similarly situated parties.

18.     Plaintiffs bring this lawsuit pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, and allege violations of the Fifth and Fourteenth Amendments to, and the Commerce Clause of, the United States Constitution.

19.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights under the United States Constitution.

20.     This Court has personal jurisdiction over Defendants because both are officials of, and reside in, the State of Michigan.

21.     Venue in this District is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

35410459.8

## FACTS

**Bowling Is a Safe, Popular, Family Activity**

22.     Bowling is a safe activity enjoyed by families all across Michigan and the most popular participation sport in the United States for those 18 and older, significantly outranking golf, fishing, tennis, billiards, bicycling, roller and ice skating, jogging, and hunting.  Bowling is also a lifetime sport in which people at any skill level, including those with major physical disabilities, can participate.  Many centers host leagues for bowlers with special needs, and persons of all ages can play the game.

23.     Michigan has more bowling centers and more bowlers per capita than any other state in the country.  Detroit has long been known as the "Bowling Capital of the World" and boasts more than 80 bowling centers and over 35,000 regular league bowlers. The industry generates revenue of nearly $400 million per year.  Michigan is home to the oldest, continuously operating bowling center in the United States:  The Garden Bowl, in downtown Detroit opened in 1913.  Michigan also has the largest bowling center in the country: Thunderbowl Lanes, a 90-lane facility in Allen Park.  Michigan has the highest high school participation in varsity bowling of any state, with over 5000 students involved and more than 700 teams.

24.     Bowling centers can operate safely in a period of COVID-19.  Bowling center guidance for operation specifies the following:  Maintaining at least one empty lane between groups of bowlers; sanitizing all center-provided equipment; removing unnecessary touch points; and installing plexiglass and other measures to increase social distancing.

**The Governor's Executive Orders and Other Actions**

25.     In response to COVID-19, on March 10, 2020, Governor Whitmer issued Executive Order 2020-04.  That order declared a state of emergency under section 1 of Article X of the

Michigan Constitution of 1963, the Emergency Management Act, 1976 PA 390, as amended, MCL 30.401 *et seq.*, (the "EMA"), and the Emergency Powers of the Governor Act of 1945, MCL 10.31 *et seq.* (the "EPGA").   On April 1, 2020, Governor Whitmer issued Executive Order 2020-33 which expanded on Executive Order 2020-04, and declared both a state of emergency and a state of disaster in Michigan.   On April 30, 2020, Governor Whitmer issued Executive Order 2020-67 to continue the emergency declaration under the EPGA, as well as Executive Order 2020-68 to issue *new* emergency and disaster declarations under the EMA.   On July 14, 2020, Governor Whitmer issued Executive Order 2020-151 extending the declaration of an emergency and disaster through August 11, 2020.

26.      The Michigan Legislature filed suit challenging Governor Whitmer's authority to issue those April 30, 2020 Executive Orders.   On May 21, 2020, the Court of Claims ruled that Executive Order 2020-67 is a valid exercise of authority under the Emergency Powers of the Governor Act but that Executive Order 2020-68 is not a valid exercise of authority under the Emergency Management Act.   Both of those rulings are under appeal with the Michigan Court of Appeals hearing scheduled on August 4, 2020.

27.      In response to COVID-19, on March 23, 2020, Governor Whitmer issued Executive Order 2020-21 ordering all people in Michigan to stay home and stay safe.   Governor Whitmer subsequently issued Executive Orders 2020-42, 2020-59, 2020-70, 2020-77, 2020-96, 2020-100, 2020-110, 2020-115, and 2020-160 which extended that initial order.   Executive Order 2020-160 was issued on July 29, 2020, consolidates numerous orders, and extends the date of the "Temporary Restrictions on certain events, gatherings and business" order indefinitely.

28.      On March 21, 2020, Governor Whitmer also issued Executive Order 2020-20 imposing restrictions on the use of places of public accommodation, ostensibly to mitigate the

spread of COVID-19. Executive Order 2020-20 was subsequently supplemented by the restrictions on in-person work, travel, and gatherings imposed by Executive Order 2020-42, which were then replaced by Executive Orders 2020-43 and 2020-59, respectively. On April 30, 2020, Governor Whitmer issued Executive Order 2020-69, which extended the restrictions on the use of places of public accommodation to May 28, 2020. Executive Order 2020-100 extended the restrictions of Executive Order 2020-69 until June 12, 2020. Executive Order 2020-110 consolidated the restrictions on use of places of public accommodation, which was contained in Executive Order 2020-69, with the restrictions on certain businesses formerly contained in Executive Order 2020-96.

29.    On May 7, 2020, Governor Whitmer unveiled for the first time the "MI Safe Start Plan" which purports to provide for a phased and regional reopening of Michigan's economy ostensibly based on the progress made in suppressing the spread of COVID-19. [https://www.michigan.gov/documents/whitmer/MI_SAFE_START_PLAN_689875_7.pdf]. These plans have not been modified since being released, yet in-person restaurant dining was allowed to occur prior to those respective regions reaching "Phase 4."

30.    On May 26, 2020, Governor Whitmer unveiled the "MI Safe Start Map," which augments the MI Safe Start Plan. The MI Safe Start Map combines all Michigan counties into 8 regions and separately assigns each region and county a risk designation principally based on confirmed COVID-19 cases and testing. [https://mistartmap.info/].

31.    For purposes of the MI Safe Start Plan, the MI Safe Start Map and Executive Order 2002-96, Michigan's counties are divided into the following regions:

**Region 1 (Detroit Region)** includes the following counties: Monroe, Washtenaw, Livingston, Genesee, Lapeer, Saint Clair, Oakland, Macomb, and Wayne.

35410459.8

**Region 2 (Grand Rapids Region)** includes the following counties: Mason, Lake, Osceola, Clare, Oceana, Newaygo, Mecosta, Isabella, Muskegon, Montcalm, Ottawa, Kent, and Ionia.

**Region 3 (Kalamazoo Region)** includes the following counties: Allegan, Barry, Van Buren, Kalamazoo, Calhoun, Berrien, Cass, Saint Joseph, and Branch.

**Region 4 (Saginaw Region)** includes the following counties: Oscoda, Alcona, Ogemaw, Iosco, Gladwin, Arenac, Midland, Bay, Saginaw, Tuscola, Sanilac, and Huron.

**Region 5 (Lansing Region)** includes the following counties: Gratiot, Clinton, Shiawassee, Eaton, and Ingham.

**Region 6 (Traverse City Region)** includes the following counties: Manistee, Wexford, Missaukee, Roscommon, Benzie, Grand Traverse, Kalkaska, Crawford, Leelanau, Antrim, Otsego, Montmorency, Alpena, Charlevoix, Cheboygan, Presque Isle, and Emmet.

**Region 7 (Jackson Region)** includes the following counties: Hillsdale, Lenawee, and Jackson.

**Region 8 (Upper Peninsula Region)** includes the following counties: Gogebic, Ontonagon, Houghton, Keweenaw, Iron, Baraga, Dickinson, Marquette, Menominee, Delta, Alger, Schoolcraft, Luce, Mackinac, and Chippewa.

One of the stated goals of the MI Safe Start Plan and MI Safe Start Map is to assist state officials, including the Governor, in state, regional and county-wide decision making related to COVID-19, including reopening the economy.

32.     Except for Regions 6 and 8, recreational bowling is prohibited by Executive Order 2020-160, which modifies Executive Orders 2020-110 and 2020-115 allowing nearly every type of business in Michigan to re-open – except for a small class of businesses including bowling centers.   Executive Order 2020-160 extends the restrictions on use of places of public accommodation, including bowling centers, indefinitely.

33.     Bowling centers are permitted to reopen in Regions 6 and 8 effective June 10, 2020. Executive Order 2020-161 replaced Executive Order 2020-145 and spells out in detail the COVID-19 safety regulations those bowling centers are required to implement.  The more stringent safety

protocols and policies recommended by the Bowling Centers of Michigan are not required in bowling centers permitted open in Regions 6 and 8; for example, every lane may be used and masks are merely recommended. *(Exhibit 3)*.

**The Impact on Plaintiffs**

34.     Under the MI Safe Start Plan, Plaintiffs' businesses can only "reopen" when COVID-19 cases are "at low absolute rates per capita," the health system capacity is "very strong," and "robust testing, contact tracing and containment protocols are in place." The MI Safe Start Plan contains no objective data or criteria from which to measure this progress or make objective decisions, and is otherwise arbitrary and vague.

35.     The COVID-19 risk "indicators" in the MI Safe Start Map being utilized by the Governor in deciding when to reopen businesses are no more objective or clear as evidenced by (among other things) its "Disclaimers":

> This dashboard presents risk and capacity indicators that are taken into consideration during the State of Michigan's development and implementation of the MI Safe Start Plan. Each indicator is assigned a level of risk. Those levels are taken into consideration, with other epidemiologic information, in assigning the overall risk level for a region. The State of Michigan's decisions about the MI Safe Start plan also take into consideration availability of mitigation and economic factors, among other factors.

> The COVID-19 pandemic is a rapidly evolving and unpredictable viral outbreak. The data and associated risk indicators represented here are derived from state and public sources that may contain inaccuracies and that are frequently updated and/or revised. Consequently, there are times that the indicators may be or appear to be inaccurate or conflicting. All data presented on this site is subject to change. The information presented on this site is for informational purposes only, does not constitute legal or medical advice, and does not replace or supersede any guidance or directives issues from the State of Michigan in connection with its MI Safe Start plan. Use caution in making any decisions based on limited or transient data presentations such as those appearing in this dashboard.

36.     Because of Executive Order 2020-160, Plaintiffs' businesses face economic ruin. Plaintiffs have lost the ability to use their real and personal property in any meaningful

economically beneficial manner.  Plaintiffs' employees have lost their ability to work at their jobs, and to receive their regular pay and health benefits.

37.     Activities less safe than recreational bowling are allowed to resume, while bowling centers remain closed.  Four leading Michigan infectious disease experts – Dr. Matthew Sims of Beaumont Health, Dr. Dennis Cunningham of McLaren Health, Dr. Mimi Emig of Spectrum Health, and Dr. Nasir Husain of Henry Ford Macomb – rated 36 activities based on COVID risks. The activities were rated from one to nine with nine being the most dangerous.  Bowling is rated as a five.  Activities that have re-opened with the same or more dangerous ratings include beaches, malls, airplanes, hair salons, barbershops, playgrounds, restaurants, public pools, and churches.[1]

38.     Effective June 15, 2020, originally under Executive Order 2020-115 and now under Executive Order 2020-160, personal care services were allowed to re-open.  By their very nature, these services require personal physical contact between the vendor and the customer.  These services include barbershops, hair salons, tattoo parlor and nail salons.

39.     While recreational bowling is not allowed, professional bowling is permitted, originally through the issuance of Executive Order 2020-133 on June 25, 2020, and now through the consolidation of Executive Order 2020-133 into Executive Order 2020-160, issued on July 29, 2020.  The safety protocols and policies recommended by the Bowling Centers of Michigan are not required to be employed during a professional bowling tournament, for example, every lane could be used; masks are not required; plexiglass and other safeguards are also not required.

---

[1] https://www.mlive.com/public-interest/2020/06/from-hair-salons-to-gyms-experts-rank-36-activities-by-coronavirus-risk-level.html (Accessed August 4, 2020).

40.     With proper implementation of health and safety measures, Plaintiffs' businesses can be operated as safely as other Michigan businesses.  Plaintiffs are no less committed to protecting their employees and customers than the Governor, and are in a better position to do so.

41.     The devastating economic impact of Executive Order 2020-160 on Plaintiffs' businesses and interstate commerce cannot be overstated.  Michigan is home to over 300 family-owned and operated bowling centers – all of which were forced to cease bowling by executive order of the Governor.  Michigan's bowling industry employs more than 10,000 people – most of whom have been laid off since March 16, 2020.

42.     Michigan's bowling centers routinely host regional and national tournaments.  In 2019, Detroit hosted the Junior Gold tournament bringing in over 4,000 youth bowlers and their families.  The economic impact of the executive orders on interstate commerce is also devastating.  Michigan is a tourism state.  Plaintiffs' businesses and those similarly situated annually attract millions of visitors from outside of the State of Michigan materially impacting interstate commerce.  In 2018, Michigan welcomed 124.8 million visitors who spent $25.7 billion.  Tourism spending supports 6% of all jobs in Michigan and generated $2.8 billion in state and local taxes in 2018.

43.     Plaintiffs' businesses are losing hundreds of millions of dollars in business opportunities as a result of the Governor's actions.  They are also experiencing harm to their reputations and their relationships with employees, vendors, and customers.

44.     Executive Order 2020-160 poses constitutional problems because some private businesses enjoy exemption from those Orders while other similarly situated businesses like Plaintiffs' do not.

35410459.8

45.     Executive Order 2020-160 is not generally applicable because it does not apply equally to all businesses that can accomplish their purposes by implementing health and safety measures that will reasonably protect their employees and guests.

46.     Executive Order 2020-160 is neither neutral nor generally applicable because Defendants have exempted certain private businesses that can accomplish their purposes through implementation of health and safety measures that will keep their employees and guests reasonably safe, but not Plaintiffs.

47.     This indiscriminate ban on recreational bowling, given Plaintiffs' abilities and willingness to implement appropriate health and safety measures that will keep their employees and guests safe, is not rationally related to the Governor's actions.

48.     The COVID-19 risk "indicators" and other criteria the Governor is using to guide her decisions on executive orders and when to reopen businesses within the State are arbitrary, vague and objectively unreasonable.

**The Impact on the Public**

49.     There is no longer an acute emergency posed by COVID-19.  As the Governor has acknowledged, the measures put in place by her executive orders have been effective.  The number of confirmed COVID-19 cases and hospitalizations have declined dramatically and continue to decrease.  Any material strain on the healthcare system has been relieved.  Testing capacity has increased substantially.

50.     Data released by the Michigan Department of Health and Human Services from August 3, 2020 demonstrated one of the lowest percentage of active cases requiring hospitalization due to COVID-19 since data tracking began at 2.67%.  (Total Hospital Inpatient: 460; Total in Critical Care: 243; On Ventilators: 132; Hospital inpatient not Critical: 85).

14

51.     The impact of Executive Order 2020-160 is also devastating to the public who rely on Plaintiffs' businesses for their livelihood and entertainment.

## CAUSES OF ACTION

### COUNT I – Violation of the Commerce Clause,
### U.S. Const. Art. I, Sec. 8, cl. 3, and 42 U.S.C. § 1983

52.     Plaintiffs incorporate herein by reference the allegations in all preceding paragraphs of this Complaint.

53.     The Commerce Clause of the United States Constitution reserves the power to regulate interstate and foreign commerce to Congress.

54.     Because these powers are reserved to Congress, individual states may not unduly burden interstate commerce.

55.     Executive Order 2020-160 imposes a burden on interstate commerce and on Plaintiffs that is clearly excessive in relation to the putative local benefits.  Plaintiffs' businesses impact the flow of interstate commerce, since some of their customers come from outside of Michigan.  In addition, due to the ban on recreational bowling in Michigan, all of Plaintiff's customers are traveling to other states to engage in recreational bowling activities.

56.     Since Plaintiffs stand ready to provide recreational opportunities through bowling under established health and safety guidelines while respecting social distancing, there is nominal or no public benefit to preventing Plaintiffs from providing these services.  Conversely, Executive Order 2020-160 incapacitates these businesses, causing job loss, loss of business revenue, and inevitably bankruptcy and permanent closure of valuable Michigan businesses.

57.     Executive Order 2020-160 impermissibly restricts Plaintiffs from exercising the right to engage in interstate commerce.

58.     Accordingly, Executive Order 2020-160 is an unconstitutional regulation of commerce and/or an undue burden on that commerce in violation of the Commerce Clause of the United States Constitution.

**COUNT II – Violation of the 14th Amendment's Due Process Clause
and 42 U.S.C. § 1983**

59.     Plaintiffs incorporate herein by reference the allegations in all preceding paragraphs of this Complaint.

60.     The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."

61.     Plaintiffs have a right to provide their businesses services, and to do so without being treated unequally by the government.

62.     Executive Order 2020-160 is neither neutral nor generally applicable.  They and other of Governor Whitmer's executive orders contain substantial exceptions with no rational basis for those exceptions.  And these Executive Orders, as applied to Plaintiffs, are not rationally related to the State's goal of preventing the spread of COVID-19.

63.     Plaintiffs have no adequate remedy at law for this continuing violation of their constitutional rights.

**COUNT III – Violation of the Takings Clauses of the U.S. & Michigan Constitutions
and 42 U.S.C. § 1983 (Individual Plaintiffs)**

64.     Plaintiffs incorporate herein by reference the allegations in all preceding paragraphs of this Complaint.

65.     Governor Whitmer has seized without appropriate compensation Plaintiffs' real and personal property by forcing material limitations on their businesses.

66.     These uncompensated seizures violate the Takings Clause of the Fifth Amendment, made applicable to States through the Fourteenth Amendment, and Article X, Section 2 of Michigan's 1963 Constitution.

67.     Executive Order 2020-160 represent a taking of Plaintiffs' property for a public purpose, as the taking is one the Governor has justified as protecting Michigan's public health, safety, and welfare.

68.     Governor Whitmer has placed the cost of any public benefit of Executive Order 2020-160 on the shoulders of private businesses like Plaintiffs and has failed to offer appropriate compensation for these takings.

69.     The Governor's executive orders materially and substantially jeopardize the sustainability of Plaintiffs' businesses and Plaintiffs' rights to property ownership.

70.     The U.S. and Michigan Takings Clauses do not prohibit the government's authority to interfere with private property, but they do require the government to pay adequate compensation for a taking.

71.     The Takings Clauses apply to permanent as well as temporary interference with private use of personal and real property.

72.     As a result of Executive Order 2020-160, Plaintiffs, and those similarly situated, have at least temporarily lost the economically beneficial use of their real and personal property.

73.     Executive Order 2020-160 effect an unconstitutional taking without just compensation.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court:

35410459.8

a.      Grant immediately an emergency, preliminary injunction that authorizes Plaintiffs to re-open and allow recreational bowling in accord with appropriate health and safety protocols;

b.      After the claims are fully adjudicated, declare Executive Order 2020-160 unconstitutional as applied, and permanently enjoin their enforcement against Plaintiffs and others similarly situated;

c.      After the claims are fully adjudicated, declare Executive Order 2020-160 as an unconstitutional taking under the U.S. and Michigan Constitutions and compensate Plaintiffs accordingly;

d.      Pursuant to 42 U.S.C. § 1988, enter an award of reasonable attorney fees and costs in favor of Plaintiffs; and

e.      Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: August 6, 2020                          */s/ Kenneth T. Brooks*
                                               Kenneth T. Brooks (P33834)

                                               *Honigman LLP*
                                               *Attorneys for Plaintiffs*
                                               222 N. Washington Sq., Suite 400
                                               Lansing, MI  48933
                                               (517) 377-0735; kbrooks@honigman.com

18

*Bo Goerger*

**VERIFICATION**

I _Bo GOERGEN_ , declare as follows:

1.    I am an adult competent to testify to the matters stated herein.

2.    I am the [_EXECUTIVE DIRECTOR_] of The Bowling Centers of Michigan and in that
FOREST VIEW LANES
capacity, I am familiar with the business of [_Bowling_____], a Plaintiff in this action.

3.    I have read the foregoing Verified Complaint for Declaratory and Injunctive

Relief, and, based upon my personal knowledge of the facts stated therein, the facts stated in

the Verified Complaint are true to the best of my knowledge and belief.

4.    If called upon to testify, I would competently testify as to the matters stated herein.

5.    Due to the restrictions on personal travel in Governor Whitmer's Executive Order

2020-158, I am unable to meet in person with a notary to verify this Complaint.

6.    Accordingly, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury

that the foregoing is true and correct.

*Bo Goerger*

Dated:    _8/4/20_

## VERIFICATION

I, Rich Kenny, declare as follows:

1.      I am an adult competent to testify to the matters stated herein.

2.      I am the Owner of Forest View Lanes, LLC and in that capacity, I am familiar with the business of Forest View Lanes, LLC, a Plaintiff in this action.

3.      I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief, and, based upon my personal knowledge of the facts stated therein, the facts stated in the Verified Complaint are true to the best of my knowledge and belief.

4.      If called upon to testify, I would competently testify as to the matters stated herein.

5.      Due to the restrictions on personal travel in Governor Whitmer's Executive Order 2020-158, I am unable to meet in person with a notary to verify this Complaint.

6.      Accordingly, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Dated: 8/4/2020

35616154.1

## **VERIFICATION**

I, Donn Slimmen, declare as follows:

1.      I am an adult competent to testify to the matters stated herein.

2.      I am the Owner of Slim's Rec, Inc. d/b/a Spartan West Bowling Center and in that capacity, I am familiar with the business of Slim's Rec, Inc. d/b/a Spartan West Bowling Center, a Plaintiff in this action.

3.      I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief, and, based upon my personal knowledge of the facts stated therein, the facts stated in the Verified Complaint are true to the best of my knowledge and belief.

4.      If called upon to testify, I would competently testify as to the matters stated herein.

5.      Due to the restrictions on personal travel in Governor Whitmer's Executive Order 2020-158, I am unable to meet in person with a notary to verify this Complaint.

6.      Accordingly, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 8-4-2020

35616212.1

## **VERIFICATION**

I, Todd Kweicien, declare as follows:

1.      I am an adult competent to testify to the matters stated herein.

2.      I am the Owner of Mr. K. Enterprises, Inc. d/b/a Royal Scot Golf & Bowl and in that capacity, I am familiar with the business of Mr. K. Enterprises, Inc. d/b/a Royal Scot Golf & Bowl, a Plaintiff in this action.

3.      I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief, and, based upon my personal knowledge of the facts stated therein, the facts stated in the Verified Complaint are true to the best of my knowledge and belief.

4.      If called upon to testify, I would competently testify as to the matters stated herein.

5.      Due to the restrictions on personal travel in Governor Whitmer's Executive Order 2020-158, I am unable to meet in person with a notary to verify this Complaint.

6.      Accordingly, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  8-4-2020

## VERIFICATION

I, Ron Eaton, declare as follows:

1. I am an adult competent to testify to the matters stated herein.

2. I am the Owner of R2M LLC d/b/a Spectrum Lanes and in that capacity, I am familiar with the business of R2M LLC d/b/a Spectrum Lanes, a Plaintiff in this action.

3. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief, and, based upon my personal knowledge of the facts stated therein, the facts stated in the Verified Complaint are true to the best of my knowledge and belief.

4. If called upon to testify, I would competently testify as to the matters stated herein.

5. Due to the restrictions on personal travel in Governor Whitmer's Executive Order 2020-158, I am unable to meet in person with a notary to verify this Complaint.

6. Accordingly, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 8/5/20

35615961.1

## **VERIFICATION**

I, Rich Glomb, declare as follows:

1.    I am an adult competent to testify to the matters stated herein.

2.    I am the Owner of And-Glo Entertainment, LLC d/b/a Merri Bowl Lanes and in that capacity, I am familiar with the business of And-Glo Entertainment, LLC d/b/a Merri Bowl Lanes, a Plaintiff in this action.

3.    I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief, and, based upon my personal knowledge of the facts stated therein, the facts stated in the Verified Complaint are true to the best of my knowledge and belief.

4.    If called upon to testify, I would competently testify as to the matters stated herein.

5.    Due to the restrictions on personal travel in Governor Whitmer's Executive Order 2020-158, I am unable to meet in person with a notary to verify this Complaint.

6.    Accordingly, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 8-4-2020

Exhibit 1



STATE OF MICHIGAN
## OFFICE OF THE GOVERNOR
LANSING

GRETCHEN WHITMER
GOVERNOR

GARLIN GILCHRIST II
LT. GOVERNOR

# EXECUTIVE ORDER

## No. 2020-160

## Amended Safe Start Order

## Rescission of Executive Orders 2020-110, 2020-115, 2020-120, 2020-133, and 2020-143

Where Michigan was once among the states most heavily hit by COVID-19, our per-capita rate of new daily cases is now roughly one-third of the national average. Our progress in suppressing the disease, however, appears to have stalled. Cases have risen over the past month—from a rolling seven-day average of 354 cases per day on June 30 to 692 cases on July 28, a two-fold increase.

The virus's resurgence is closely associated with super-spreading events at large social gatherings, often attended by young people. More than 50 cases have been linked to a single house party in Saline; an outbreak at a Lansing bar has resulted in 187 infections; and a sandbar party at Torch Lake over the July 4 weekend led to at least 43 confirmed cases.

We cannot afford to relax our vigilance if we hope to restart our economy, open our schools, and avoid a second wave. This executive order therefore prohibits any indoor social gatherings of more than 10 people statewide. At the same time, the order also closes bars across the state, including in the Traverse City region and the Upper Peninsula. For the time being, Michiganders must curtail their social gatherings for the good of the community.

As a matter of housekeeping, I am also rescinding a series of prior orders and incorporating them into this comprehensive order governing the activities in Michigan that remain restricted on account of the pandemic. I am taking the occasion, too, to allow for the reopening of the Detroit casinos, subject to a 15% capacity limit and strict workplace safeguards. Casinos have been operating safely across most of the country and in tribal areas in Michigan and should be able to do so in the Detroit region as well.

The novel coronavirus (COVID-19) is a respiratory disease that can result in serious illness or death. It is caused by a new strain of coronavirus not previously identified in humans and easily spread from person to person. There is currently no approved vaccine for this disease.

On March 10, 2020, the Department of Health and Human Services identified the first two presumptive-positive cases of COVID-19 in Michigan. On that same day, I issued Executive Order 2020-4. This order declared a state of emergency across the state of Michigan under section 1 of article 5 of the Michigan Constitution of 1963, the Emergency Management Act, 1976 PA 390, as amended (EMA), MCL 30.401 et seq., and the Emergency Powers of the Governor Act of 1945, 1945 PA 302, as amended (EPGA), MCL 10.31 et seq.

Since then, the virus spread across Michigan, bringing deaths in the thousands, confirmed cases in the tens of thousands, and deep disruption to this state's economy, homes, and educational, civic, social, and religious institutions. On April 1, 2020, in response to the widespread and severe health, economic, and social harms posed by the COVID-19 pandemic, I issued Executive Order 2020-33. This order expanded on Executive Order 2020-4 and declared both a state of emergency and a state of disaster across the State of Michigan under section 1 of article 5 of the Michigan Constitution of 1963, the Emergency Management Act, and the Emergency Powers of the Governor Act of 1945. And on April 30, 2020, finding that COVID-19 had created emergency and disaster conditions across the State of Michigan, I issued Executive Order 2020-67 to continue the emergency declaration under the EPA, as well as Executive Order 2020-68 to issue new emergency and disaster declarations under the EMA.

Those executive orders have been challenged in *Michigan House of Representatives and Michigan Senate v. Whitmer*. On May 21, 2020, the Court of Claims ruled that Executive Order 2020-67 is a valid exercise of authority under the Emergency Powers of the Governor Act but that Executive Order 2020-68 is not a valid exercise of authority under the Emergency Management Act. Both of those rulings are being challenged on appeal.

On June 18, 2020, I issued Executive Order 2020-127, again finding that the COVID-19 pandemic constitutes a disaster and emergency throughout the State of Michigan. That order constituted a state of emergency declaration under the Emergency Powers of the Governor Act of 1945. And, to the extent the governor may declare a state of emergency and a state of disaster under the Emergency Management Act when emergency and disaster conditions exist yet the legislature had declined to grant an extension request, that order also constituted a state of emergency and state of disaster declaration under that act.

The Emergency Powers of the Governor Act provides a sufficient legal basis for issuing this executive order. In relevant part, it provides that, after declaring a state of emergency, "the governor may promulgate reasonable orders, rules, and regulations as he or she considers necessary to protect life and property or to bring the emergency situation within the affected area under control." MCL 10.31(1).

Nevertheless, subject to the ongoing litigation and the possibility that current rulings may be overturned or otherwise altered on appeal, I also invoke the Emergency Management Act as a basis for executive action to combat the spread of COVID-19 and mitigate the effects of this emergency on the people of Michigan, with the intent to preserve the rights

and protections provided by the EMA. The EMA vests the governor with broad powers and duties to "cop[e] with dangers to this state or the people of this state presented by a disaster or emergency," which the governor may implement through "executive orders, proclamations, and directives having the force and effect of law." MCL 30.403(1)–(2). This executive order falls within the scope of those powers and duties, and to the extent the governor may declare a state of emergency and a state of disaster under the Emergency Management Act when emergency and disaster conditions exist yet the legislature has not granted an extension request, they too provide a sufficient legal basis for this order.

To suppress the spread of COVID-19, to prevent the state's health care system from being overwhelmed, to allow time for the production of critical test kits, ventilators, and personal protective equipment, to establish the public health infrastructure necessary to contain the spread of infection, and to avoid needless deaths, it was reasonable and necessary to direct residents to remain at home or in their place of residence to the maximum extent feasible. To that end, on March 23, 2020, I issued Executive Order 2020-21, ordering all people in Michigan to stay home and stay safe. In Executive Orders 2020-42, 2020-59, 2020-70, 2020-77, 2020-92, 2020-96, 2020-110, and 2020-115, I extended that initial order, modifying its scope as needed and appropriate to match the ever-changing circumstances presented by this pandemic.

Acting under the Michigan Constitution of 1963 and Michigan law, I find it reasonable and necessary, for the reasons outlined above, to order:

1. **Remote work.** Any work that is capable of being performed remotely (i.e., without the worker leaving his or her home or place of residence) must be performed remotely.

2. **Workplace safety.** Any business or operation that requires its employees to leave their home or place of residence for work is subject to the rules on workplace safeguards in Executive Order 2020-161 or any order that may follow from it.

3. **Individual responsibility.** Any individual who leaves his or her home or place of residence must:

    (a) Follow social distancing measures recommended by the Centers for Disease Control and Prevention ("CDC"), including remaining at least six feet from people from outside the individual's household to the extent feasible under the circumstances; and

    (b) Follow the rules described in Executive Order 2020-153 or any order that may follow from it governing masks.

4. **Public accommodations restrictions.** Subject to the exceptions in sections 8 and 9, the following places are closed to entry, use, and occupancy by members of the public:

    (a) Indoor theaters, cinemas, and performance venues;

(b) Indoor gymnasiums, fitness centers, recreation centers, sports facilities, exercise facilities, exercise studios, and the like;

(c) Millionaire Parties licensed by the Michigan Gaming Control Board;

(d) Until August 5, 2020 at 10 a.m., casinos licensed by the Michigan Gaming Control Board and racetracks licensed by the Michigan Gaming Control Board. After such time, such establishments may operate, subject to the rules on workplace safeguards described in Executive Order 2020-161 or any order that may follow from it; and

(e) Indoor services or facilities, or outdoor services or facilities involving close contact of persons, for amusement or other recreational or entertainment purposes, such as amusement parks, arcades, bingo halls, bowling alleys, indoor climbing facilities, indoor dance areas, skating rinks, trampoline parks, carnival or amusement rides as defined by MCL 408.652(2), water parks, and other similar recreational or entertainment facilities.

5. **Bars.** Food service establishments, as defined in section 1107(t) of the Michigan Food Law, 2000 PA 92, as amended, MCL 289.1107(t), that hold on-premises retailer licenses to sell alcoholic beverages must close for indoor service if they earn more than 70% of their gross receipts from sales of alcoholic beverages.

(a) Food service establishments that are closed for indoor service but open for outdoor service must prohibit patrons from entering the establishment, except to walk through in order to access the outdoor area, to leave the establishment, or to use the restroom.

(b) For purposes of calculating its percentage of gross receipts from sales of alcoholic beverages under section 1, a food service establishment must use:

(1) Gross receipts from 2019; or

(2) If the establishment was not in operation in 2019, gross receipts from the date the establishment opened in 2020.

6. **Liquor license restrictions.** Dance and topless activity permits issued under subsections 2 or 3 of section 916 of the Michigan Liquor Control Code, 1998 PA 58, as amended, MCL 436.1916(2) and (3), are temporarily suspended. Combination dance–entertainment permits and topless activity–entertainment permits issued under subsection 4 of section 916 of the Michigan Liquor Control Code, MCL 436.1916(4), are suspended to the extent they allow dancing and topless activity, but remain valid to the extent they allow other entertainment.

(a) In enforcing the Michigan Liquor Control Code, the Michigan Liquor Control Commission will consider whether the public health, safety or welfare requires summary, temporary suspension of a license under section 92 of the

4

Administrative Procedures Act of 1969, 1969 PA 306, as amended, MCL 24.292(2).

(b) Nothing in this order or in Executive Order 2020-161 prevents food service establishments from selling alcoholic beverages for off-premises consumption to patrons who are not seated at a table, or to require such patrons to remain seated when ordering such beverages.

(c) Nothing in this order or in Executive Order 2020-161 prevents the holder of a social district license under section 551 of the Michigan Liquor Control Code, 1998 PA 58, as amended, MCL 436.1551:

(1) From selling alcoholic beverages for consumption in a commons area within a designated social district to patrons who are not seated at a table; or

(2) To require such patrons to remain seated when ordering such beverages.

**7. Rules on gatherings, events, and large venues.**

(a) A social gathering or organized event among persons not part of the same household is permitted, but only to the extent that:

(1) The gathering or event is designed to ensure that persons not part of the same household maintain six feet of distance from one another;

(2) Persons not part of the same household maintain six feet of distance from one another;

(3) If it is indoors, the gathering or event does not exceed 10 people; and

(4) If it is outdoors, the gathering or event does not exceed 100 people.

(b) Subsection (a) does not apply to the incidental gathering of persons in a shared space, including an airport, bus station, factory floor, restaurant, shopping mall, public pool, or workplace.

(c) Notwithstanding the restrictions in subsection (a) or in subsections 8(c) or 8(d), professional sports leagues and teams, including professional athletes engaged in individual sports, may resume operations, provided that:

(1) No live audiences are allowed, except for staff of the facility at which a sporting event is held and media personnel reporting on, filming, or otherwise documenting the sporting event;

(2) The activities are conducted pursuant to a COVID-19 safety plan that is consistent with any guidance from the Centers for Disease Control and Prevention and the Michigan Department of Health and Human Services; and

(3) Participants maintain six feet of distance from one another to the extent compatible with the sporting activity.

(d) The restrictions described in subsection (a)(3) do not apply to polling places.

8. **Regions 6 and 8.**

(a) The restrictions described in section 4 of this order do not apply in Regions 6 and 8.

(b) Notwithstanding section 7(a)(4) of this order, an outdoor social gathering or outdoor organized event among persons not part of the same household is permitted in Regions 6 and 8, but only to the extent that the gathering or event does not exceed 250 people and complies with subsection 7(a)(1) and 7(a)(2) of this order.

(c) In Regions 6 and 8, and notwithstanding the restrictions in section 7(a), an indoor arcade, bowling alley, cinema, climbing facility, convention center, performance space, meeting hall, sports arena, theater, or similar indoor venue may be open to spectators or patrons, but only to the extent that it:

(1) Arranges the venue such that persons not part of the same household may maintain six feet of distance from one another at all times while in the venue; and

(2) Limits the number of people in the venue to 25% of its maximum capacity or to 250, whichever is smaller. For purposes of this order, each separate auditorium or screening room is a separate venue.

(d) In Regions 6 and 8, and notwithstanding the restrictions in section 8(b), an outdoor concert space, race track, sports arena, stadium, or similar outdoor venue may, be open to spectators or patrons, but only to the extent that it:

(1) Arranges the venue such that persons not part of the same household may maintain six feet of distance from one another at all times while in the venue; and

(2) Limits the number of people in the venue to 25% of its maximum capacity or to 500, whichever is smaller.

9. **Exceptions.** The restrictions imposed by sections 4 of this order do not apply to any of the following:

(a) If they are outdoors, fitness classes, athletic practices, training sessions, or games, provided that coaches, spectators, and participants not from the same household maintain six feet of distance from one another at all times during such activities, and that equipment and supplies are shared to the minimum extent possible and are subject to frequent and thorough disinfection and cleaning;

(b) Services necessary for medical treatment as determined by a licensed medical provider;

(c) Health care facilities, residential care facilities, congregate care facilities, and juvenile justice facilities;

(d) Crisis shelters or similar institutions;

(e) Food courts inside the secured zones of airports; and

(f) Employees, contractors, vendors, or suppliers who enter, use, or occupy the places described in section 4 of this order in their professional capacity.

10. **Parks.** Unless otherwise prohibited by local regulation, outdoor parks and recreational facilities may be open, provided that they make any reasonable modifications necessary to enable employees and patrons not part of the same household to maintain six feet of distance from one another, and provided that areas in which social distancing cannot be maintained be closed, subject to guidance issued by the Michigan Department of Health and Human Services.

11. **Pools.** Unless otherwise prohibited by local regulation, public swimming pools, as defined by MCL 333.12521(d), may be open, subject to guidance issued by the Department of Health and Human Services, provided that:

(a) If they are outdoors, they limit capacity to 50% of the bather capacity limits described in Rule 325.2193 of the Michigan Administrative Code;

(b) If they are indoors and located in Regions 6 or 8, they limit capacity to 25% of the bather capacity limits described in Rule 325.2193 of the Michigan Administrative Code;

(c) If they are indoors and located outside of Regions 6 or 8, they open only for infant and child drowning prevention classes and limit capacity to 25% of the bather capacity limits described in Rule 325.2193 of the Michigan Administrative Code; and

(d) They limit capacity on the pool deck to ensure that persons not part of the same household maintain six feet of distance from one another.

12. **Region definitions.** For purposes of this order, Michigan comprises eight separate regions.

(a) Region 1 includes the following counties: Monroe, Washtenaw, Livingston, Genesee, Lapeer, Saint Clair, Oakland, Macomb, and Wayne.

(b) Region 2 includes the following counties: Mason, Lake, Osceola, Clare, Oceana, Newaygo, Mecosta, Isabella, Muskegon, Montcalm, Ottawa, Kent, and Ionia.

(c)   Region 3 includes the following counties: Allegan, Barry, Van Buren, Kalamazoo, Calhoun, Berrien, Cass, Saint Joseph, and Branch.

(d)   Region 4 includes the following counties: Oscoda, Alcona, Ogemaw, Iosco, Gladwin, Arenac, Midland, Bay, Saginaw, Tuscola, Sanilac, and Huron.

(e)   Region 5 includes the following counties: Gratiot, Clinton, Shiawassee, Eaton, and Ingham.

(f)   Region 6 includes the following counties: Manistee, Wexford, Missaukee, Roscommon, Benzie, Grand Traverse, Kalkaska, Crawford, Leelanau, Antrim, Otsego, Montmorency, Alpena, Charlevoix, Cheboygan, Presque Isle, and Emmet.

(g)   Region 7 includes the following counties: Hillsdale, Lenawee, and Jackson.

(h)   Region 8 includes the following counties: Gogebic, Ontonagon, Houghton, Keweenaw, Iron, Baraga, Dickinson, Marquette, Menominee, Delta, Alger, Schoolcraft, Luce, Mackinac, and Chippewa.

13. **Separation of powers.** Nothing in this order should be taken to interfere with or infringe on the powers of the legislative and judicial branches to perform their constitutional duties or exercise their authority. Similarly, nothing in this order shall be taken to abridge protections guaranteed by the state or federal constitution under these emergency circumstances.

14. **Religious worship.** Consistent with prior guidance, neither a place of religious worship nor its owner is subject to penalty under section 17 of this order for allowing religious worship at such place. No individual is subject to penalty under section 17 of this order for engaging in religious worship at a place of religious worship.

15. **Effective date.** Except as otherwise specified, this order takes effect at 12:01 a.m. on July 31, 2020. At that time, Executive Orders 2020-110, 2020-115, 2020-120, 2020-133, and 2020-143 are rescinded. Except as otherwise specified, nothing in this order supersedes any other executive order.

16. **Future orders.** In determining whether to maintain, intensify, or relax the restrictions in this order, I will consider, among other factors, (1) data on COVID-19 infections and the disease's rate of spread; (2) whether sufficient medical personnel, hospital beds, and ventilators exist to meet anticipated medical need; (3) the availability of personal protective equipment for the health care workforce; (4) the state's capacity to test for COVID-19 cases and isolate infected people; and (5) economic conditions in the state.

17. **Penalty.** Consistent with MCL 10.33 and MCL 30.405(3), a willful violation of this order is a misdemeanor.

Given under my hand and the Great Seal of the State of Michigan.

Date:   July 29, 2020

Time:  5:31pm

_____
GRETCHEN WHITMER
GOVERNOR


By the Governor:


_____
SECRETARY OF STATE

9

Exhibit 2



**Bowling Centers Association of Michigan**

BCAM is an official state affiliate of **BPAA**

28200 Southfield Road – Lathrup Village, MI  48076 – 248-559-5207 – www.michiganbowl.com

Governor Whitmer
P.O. Box 30013
Lansing, MI 48909

Dear Governor:

We ask you to include bowling centers as part of your next phase of reopening Michigan's economy. The bowling centers across Michigan employ approximately 6,000 Michiganders. Our state's bowling and entertainment centers are committed to working with your administration to ensure that we keep our employees and the communities that we serve safe and healthy.

The bowling industry is ready to reopen our centers to the community and maintain the highest health and safety standards. We are committed to implementing appropriate policies and best practices that prioritize and protect the health and safety of our employees and customers. We will strictly adhere and adjust to current OSHA, CDC, state and local guidance, as necessary.

Attached are guidelines created by a task force composed of our dedicated proprietors. You will see we have taken the utmost care and concern for both employees and customers of our businesses. Our members are committed to providing a safe entertainment venue for our communities.

The Bowling Centers Association of Michigan (BCAM) represents 165 of the bowling centers in Michigan. Our members are small businesses at the heart of our communities. We contribute to the economic wellbeing of each city or town we occupy by employing local staff, holding fundraisers for various charities, local schools and organizations and we support the mental and physical health of our communities through providing an exercise option that all individuals can benefit from regardless of age or physical ability.

Our members appreciate your leadership throughout this challenging period for Michiganders and the nation and we look forward to working with you to support our small businesses and communities as we safely reopen our economy.

Please contact our Executive Director, Bo Goergen, at 989-600-0992 with questions or feedback.

Sincerely,

*Bo Goergen*

Bo Goergen, Executive Director
Bowling Centers Association of Michigan
Lathrup Village, MI  48076
E: bogoergen862@gmail.com
C: 989-600-0992

35632837.1



The Bowling Centers Association of Michigan (BCAM) has developed guidelines to maximize the safety, health and peace of mind for our employees, customers and vendors.

The BCAM will provide signage, educational material and templates for documenting the policies and best practices described below.

Though OSHA's Guidance on Preparing Workplaces for COVID-19 would classify our business as Lower Exposure Risk, we will be implementing guidance applicable to Medium Exposure Risk jobs as defined by OSHA.

**Bowling Center Guidance for Re-Opening and Continued Operation**

**Prior To Opening**

1. Documentation and guidance
   a. Develop a COVID-19 preparedness and response plan consistent with OSHA, CDC, state and local guidance.  The BCAM will provide a general plan to each center for customization.  This plan must be accessible for review by staff, customers and vendors if requested.
   b. Ensure all sanitation instructions and templates are available for staff to document execution of these activities.
2. Sanitation
   a. Each bowling center will be thoroughly cleaned utilizing EPA recommended disinfectants.
   b. Ensure minimum contact time is met to disinfect high-touch surfaces including, but not limited to:
      - Bowling balls and shoes
      - Furniture and ball returns
      - Touch screens and monitors
      - Door handles and railing
      - Restroom facilities
      - Vending machines and games
3. Employees
   a. Provide education for all staff through review of the bowling center's preparedness and response plan and signage.
   b. Provide face coverings, gloves and hand sanitizer to all employees.

**Routine Operation**

Our bowling centers will adhere to the policies and procedures detailed in our COVID-19 preparedness and response plan (attached).  The preparedness and response plan will contain the following sections and minimum expectations in alignment with current OSHA, CDC, state and local guidance:

1. Screening and Policies for Customers and Employees Exhibiting Signs and Symptoms of COVID-19
   a. Each employee will be asked if they are ill or have exhibited symptoms commonly associated with COVID-19 upon reporting to work.  If any employee experiences symptoms while at work, they will be isolated until they can be sent home.

    b.  All employees will be screened utilizing a touchless forehead temperature thermometer.

    c.  All customers will be screened upon entrance to our facilities through a single entry point utilizing a touchless forehead temperature thermometer.

    d.  Employees are not to report to work if they display respiratory symptoms or have had contact with a person with a confirmed diagnosis of COVID-19.

    e.  Employee leave policies that promote stay-at-home.

    f.  No requirement to validate illness with health care provided note prior to return to work.

2. Handwashing and Respiratory Etiquette

    a.  Employees are instructed to wash their hands for at least 20 seconds with soap and water frequently throughout the day, but especially at the beginning and end of their shift, prior to any mealtimes and after using the restroom.

    b.  Hand sanitizer (greater than 60% alcohol) will be available for employees and customers.

    c.  Employees and customers are being instructed to cover their mouth and nose with their sleeve or a tissue when coughing or sneezing and to avoid touching their face, specifically their mouth, nose and eyes, with their hands.  Respiratory etiquette will be demonstrated on posters and supported by making tissues and trash receptacles available to all employees and customers.

3. Physical Distancing and Personal Protection

    a.  Bowling / entertainment centers will be limiting entrance to our facilities to a single entrance.  All exits will be maintained to ensure compliance with fire safety regulations.

    b.  The number of staff behind the counter and kitchen will be limited to ensure a minimum 6-feet distances between individuals.

    c.  Signage or markings will be visible throughout the bowling center, bar, restaurant and banquet spaces indicating 6-feet distancing for customers in line for service and other areas that can produce customer congestion.

    d.  At least one lane will be open between groups.

    e.  Occupancy will be limited to **25%** of our occupancy limit as determined by the Fire Marshal or **4** people per 1,000 square feet for centers over 50,000 square feet in size.

    f.  Customer demand in excess of our stated capacity will be staged exterior to the facility or in other approved areas where appropriate physical distancing is observed.

    g.  Where appropriate, physical barriers will be provided to minimize contact with customers.

    h.  All employees will be provided face coverings and latex / nitrile disposable gloves for use during their shift.

    i.  Face coverings and latex / nitrile gloves will be made available for each customer entering our facilities for use if requested.

4. Housekeeping

    a.  Regular, scheduled housekeeping practices are defined, implemented and documented, including routine cleaning and disinfecting of high-touch surfaces, bowling equipment and areas in the work environment, including restrooms, furniture, ball returns, game rooms and vending machines.  Frequent cleaning and disinfecting will be conducted in high-touch areas, such as phones, touch screens, door handles, railings, etc.  Approved disinfectants will be used.

    b.  Trash receptacles will be sanitized and open to ensure no touch disposal of items.

    c.  Scoring touch screens and monitors will be disinfected after each use and 'no touch' bowler name entry from the counter is strongly encouraged.

    d.  All provided bowling equipment (house balls, house shoes) will be disinfected after each use.  Customers will be instructed to leave bowling balls on the ball returns following use for employees to disinfect and return to the racks.

     e.  Front counter will be sanitized after each group and prior to servicing the next.

     f.  All contact surfaces (seating, tables) will be disinfected after each use ensuring minimum contact time for disinfection prior to allowing the next group to occupy the space.

5. Communications and Training
6. Links to Current Guidance and Training Materials

With the support of the BCAM, the thoroughness of our proposed guidance and the dedication/diligence of our proprietors and employees we are confident that we can safely reopen and effectively serve our employees, their families and our communities.

It is our assertion that these guidelines will assist local and state health departments in ensuring the health and safety of bowling center employees and customers.

BCAM Task Force Members

1. Mike Vallender, Ionia

2. Paul Abromaitis, Almont

3. Rich Kenney, Temperance

4. Nate Cranson, Bronson

5. John Casbar, Rochester Hills

6. Tom Reaume, Detroit

7. Bo Goergen, Midland

8. Philip Huffman, Holland

Exhibit 3



STATE OF MICHIGAN

GRETCHEN WHITMER
GOVERNOR

# OFFICE OF THE GOVERNOR
LANSING

GARLIN GILCHRIST II
LT. GOVERNOR

# EXECUTIVE ORDER

## No. 2020-161

## Safeguards to protect Michigan's workers from COVID-19

## Rescission of Executive Order 2020-145

Businesses must continue to do their part to protect their employees, their patrons, and their communities. Many businesses have already done so by implementing robust safeguards to prevent viral transmission. But we can and must do more: no one should feel unsafe at work. With Executive Orders 2020-91, 2020-97, 2020-114, and 2020-145, I created workplace standards that apply to all businesses across the state. I am now rescinding and reissuing an amended version of those standards to add a new section on casinos.

---

The novel coronavirus (COVID-19) is a respiratory disease that can result in serious illness or death. It is caused by a new strain of coronavirus not previously identified in humans and easily spread from person to person. There is currently no approved vaccine or antiviral treatment for this disease.

On March 10, 2020, the Department of Health and Human Services identified the first two presumptive-positive cases of COVID-19 in Michigan. On that same day, I issued Executive Order 2020-4. This order declared a state of emergency across the state of Michigan under section 1 of article 5 of the Michigan Constitution of 1963, the Emergency Management Act, 1976 PA 390, as amended (EMA), MCL 30.401 et seq., and the Emergency Powers of the Governor Act of 1945, 1945 PA 302, as amended (EPGA), MCL 10.31 et seq.

Since then, the virus spread across Michigan, bringing deaths in the thousands, confirmed cases in the tens of thousands, and deep disruption to this state's economy, homes, and educational, civic, social, and religious institutions. On April 1, 2020, in response to the widespread and severe health, economic, and social harms posed by the COVID-19 pandemic, I issued Executive Order 2020-33. This order expanded on Executive Order 2020-4 and declared both a state of emergency and a state of disaster across the State of Michigan under section 1 of article 5 of the Michigan Constitution of 1963, the Emergency Management Act, and the Emergency Powers of the Governor Act of 1945. And on April 30, 2020, finding that COVID-19 had created emergency and disaster conditions across the

GEORGE W. ROMNEY BUILDING • 111 SOUTH CAPITOL AVENUE • LANSING, MICHIGAN 48909
www.michigan.gov
PRINTED IN-HOUSE

State of Michigan, I issued Executive Order 2020-67 to continue the emergency declaration under the EPA, as well as Executive Order 2020-68 to issue new emergency and disaster declarations under the EMA.

Those executive orders have been challenged in *Michigan House of Representatives and Michigan Senate v. Whitmer*. On May 21, 2020, the Court of Claims ruled that Executive Order 2020-67 is a valid exercise of authority under the Emergency Powers of the Governor Act but that Executive Order 2020-68 is not a valid exercise of authority under the Emergency Management Act. Both of those rulings are being challenged on appeal.

On June 18, 2020, I issued Executive Order 2020-127, again finding that the COVID-19 pandemic constitutes a disaster and emergency throughout the State of Michigan. That order constituted a state of emergency declaration under the Emergency Powers of the Governor Act of 1945. And, to the extent the governor may declare a state of emergency and a state of disaster under the Emergency Management Act when emergency and disaster conditions exist yet the legislature had declined to grant an extension request, that order also constituted a state of emergency and state of disaster declaration under that act.

The Emergency Powers of the Governor Act provides a sufficient legal basis for issuing this executive order. In relevant part, it provides that, after declaring a state of emergency, "the governor may promulgate reasonable orders, rules, and regulations as he or she considers necessary to protect life and property or to bring the emergency situation within the affected area under control." MCL 10.31(1).

Nevertheless, subject to the ongoing litigation and the possibility that current rulings may be overturned or otherwise altered on appeal, I also invoke the Emergency Management Act as a basis for executive action to combat the spread of COVID-19 and mitigate the effects of this emergency on the people of Michigan, with the intent to preserve the rights and protections provided by the EMA. The EMA vests the governor with broad powers and duties to "cop[e] with dangers to this state or the people of this state presented by a disaster or emergency," which the governor may implement through "executive orders, proclamations, and directives having the force and effect of law." MCL 30.403(1)–(2). This executive order falls within the scope of those powers and duties, and to the extent the governor may declare a state of emergency and a state of disaster under the Emergency Management Act when emergency and disaster conditions exist yet the legislature has not granted an extension request, they too provide a sufficient legal basis for this order.

To suppress the spread of COVID-19, to prevent the state's health care system from being overwhelmed, to allow time for the production of critical test kits, ventilators, and personal protective equipment, to establish the public health infrastructure necessary to contain the spread of infection, and to avoid needless deaths, it was reasonable and necessary to direct residents to remain at home or in their place of residence to the maximum extent feasible. To that end, on March 23, 2020, I issued Executive Order 2020-21, ordering all people in Michigan to stay home and stay safe. In Executive Orders 2020-42, 2020-59, 2020-70, 2020-77, 2020-92, 2020-96, and 2020-110, I extended that initial order, modifying its scope as needed and appropriate to match the ever-changing circumstances presented by this pandemic.

2

The measures put in place by these executive orders have been effective. Although the virus remains aggressive and persistent—on July 28, Michigan reported a total of 79,176 confirmed cases and 6,170 deaths—the strain on our health care system has relented, even as our testing capacity has increased. Where Michigan was once among the states most heavily hit, our per-capita case rate is now roughly one third to the national average.

Acting under the Michigan Constitution of 1963 and Michigan law, I find it reasonable and necessary, for the reasons outlined above, to order:

1. All businesses or operations that require their employees to leave the homes or residences for work must, at a minimum:

    (a) Develop a COVID-19 preparedness and response plan, consistent with recommendations in Guidance on Preparing Workplaces for COVID-19, developed by the Occupational Health and Safety Administration ("OSHA") and available here. Within two weeks of resuming in-person activities, a business's or operation's plan must be made readily available to employees, labor unions, and customers, whether via website, internal network, or by hard copy.

    (b) Designate one or more worksite supervisors to implement, monitor, and report on the COVID-19 control strategies developed under subsection (a). The supervisor must remain on-site at all times when employees are present on site. An on-site employee may be designated to perform the supervisory role.

    (c) Provide COVID-19 training to employees that covers, at a minimum:

        (1) Workplace infection-control practices.

        (2) The proper use of personal protective equipment.

        (3) Steps the employee must take to notify the business or operation of any symptoms of COVID-19 or a suspected or confirmed diagnosis of COVID-19.

        (4) How to report unsafe working conditions.

    (d) Provide any communication and training on COVID-19 infection control practices in the primary languages common in the employee population.

    (e) Place posters in the languages common in the employee population that encourage staying home when sick, cough and sneeze etiquette, and proper hand hygiene practices.

    (f) Conduct a daily entry self-screening protocol for all employees or contractors entering the workplace, including, at a minimum, a questionnaire covering symptoms and suspected or confirmed exposure to people with possible COVID-19.

3

(g) Keep everyone on the worksite premises at least six feet from one another to the maximum extent possible, including through the use of ground markings, signs, and physical barriers, as appropriate to the worksite.

(h) Provide non-medical grade face coverings to their employees, with supplies of N95 masks and surgical masks reserved, for now, for health care professionals, first responders (e.g., police officers, fire fighters, paramedics), and other critical workers.

(i) Require face coverings to be worn when employees cannot consistently maintain six feet of separation from other individuals in the workplace, and consider face shields when employees cannot consistently maintain three feet of separation from other individuals in the workplace.

(j) Require face coverings in shared spaces, including during in-person meetings and in restrooms and hallways.

(k) Increase facility cleaning and disinfection to limit exposure to COVID-19, especially on high-touch surfaces (e.g., door handles), paying special attention to parts, products, and shared equipment (e.g., tools, machinery, vehicles).

(l) Adopt protocols to clean and disinfect the facility in the event of a positive COVID-19 case in the workplace.

(m) Make cleaning supplies available to employees upon entry and at the worksite and provide time for employees to wash hands frequently or to use hand sanitizer.

(n) When an employee is identified with a confirmed case of COVID-19:

(1) Immediately notify the local public health department, and

(2) Within 24 hours, notify any co-workers, contractors, or suppliers who may have come into contact with the person with a confirmed case of COVID-19.

(o) An employer will allow employees with a confirmed or suspected case of COVID-19 to return to the workplace only after they are no longer infectious according to the latest guidelines from the Centers for Disease Control and Prevention ("CDC") and they are released from any quarantine or isolation by the local public health department.

(p) Follow Executive Order 2020-36, and any executive orders that follow it, that prohibit discharging, disciplining, or otherwise retaliating against employees who stay home or who leave work when they are at particular risk of infecting others with COVID-19.

(q) Establish a response plan for dealing with a confirmed infection in the workplace, including protocols for sending employees home and for temporary closures of all or part of the workplace to allow for deep cleaning.

4

(r)  Restrict business-related travel for employees to essential travel only.

(s)  Encourage employees to use personal protective equipment and hand sanitizer on public transportation.

(t)  Promote remote work to the fullest extent possible.

(u)  Adopt any additional infection-control measures that are reasonable in light of the work performed at the worksite and the rate of infection in the surrounding community.

2.  Businesses or operations whose work is primarily and traditionally performed outdoors must:

(a)  Prohibit gatherings of any size in which people cannot maintain six feet of distance from one another.

(b)  Limit in-person interaction with clients and patrons to the maximum extent possible, and bar any such interaction in which people cannot maintain six feet of distance from one another.

(c)  Provide and require the use of personal protective equipment such as gloves, goggles, face shields, and face coverings, as appropriate for the activity being performed.

(d)  Adopt protocols to limit the sharing of tools and equipment to the maximum extent possible and to ensure frequent and thorough cleaning and disinfection of tools, equipment, and frequently touched surfaces.

3.  Businesses or operations in the construction industry must:

(a)  Conduct a daily entry screening protocol for employees, contractors, suppliers, and any other individuals entering a worksite, including a questionnaire covering symptoms and suspected or confirmed exposure to people with possible COVID-19, together with, if possible, a temperature screening.

(b)  Create dedicated entry point(s) at every worksite, if possible, for daily screening as provided in sub-provision (b) of this section, or in the alternative issue stickers or other indicators to employees to show that they received a screening before entering the worksite that day.

(c)  Provide instructions for the distribution of personal protective equipment and designate on-site locations for soiled face coverings.

(d)  Require the use of work gloves where appropriate to prevent skin contact with contaminated surfaces.

5

(e) Identify choke points and high-risk areas where employees must stand near one another (such as hallways, hoists and elevators, break areas, water stations, and buses) and control their access and use (including through physical barriers) so that social distancing is maintained.

(f) Ensure there are sufficient hand-washing or hand-sanitizing stations at the worksite to enable easy access by employees.

(g) Notify contractors (if a subcontractor) or owners (if a contractor) of any confirmed COVID-19 cases among employees at the worksite.

(h) Restrict unnecessary movement between project sites.

(i) Create protocols for minimizing personal contact upon delivery of materials to the worksite.

4. Manufacturing facilities must:

(a) Conduct a daily entry screening protocol for employees, contractors, suppliers, and any other individuals entering the facility, including a questionnaire covering symptoms and suspected or confirmed exposure to people with possible COVID-19, together with temperature screening.

(b) Create dedicated entry point(s) at every facility for daily screening as provided in sub-provision (a) of this section, and ensure physical barriers are in place to prevent anyone from bypassing the screening.

(c) Suspend all non-essential in-person visits, including tours.

(d) Train employees on, at a minimum:

   (1) Routes by which the virus causing COVID-19 is transmitted from person to person.

   (2) Distance that the virus can travel in the air, as well as the time it remains viable in the air and on environmental surfaces.

   (3) The use of personal protective equipment, including the proper steps for putting it on and taking it off.

(e) Reduce congestion in common spaces wherever practicable by, for example, closing salad bars and buffets within cafeterias and kitchens, requiring individuals to sit at least six feet from one another, placing markings on the floor to allow social distancing while standing in line, offering boxed food via delivery or pick-up points, and reducing cash payments.

(f) Implement rotational shift schedules where possible (e.g., increasing the number of shifts, alternating days or weeks) to reduce the number of employees in the facility at the same time.

(g) Stagger meal and break times, as well as start times at each entrance, where possible.

(h) Install temporary physical barriers, where practicable, between work stations and cafeteria tables.

(i) Create protocols for minimizing personal contact upon delivery of materials to the facility.

(j) Adopt protocols to limit the sharing of tools and equipment to the maximum extent possible.

(k) Ensure there are sufficient hand-washing or hand-sanitizing stations at the worksite to enable easy access by employees, and discontinue use of hand dryers.

(l) Notify plant leaders and potentially exposed individuals upon identification of a positive case of COVID-19 in the facility, as well as maintain a central log for symptomatic employees or employees who received a positive test for COVID-19.

(m) Send potentially exposed individuals home upon identification of a positive case of COVID-19 in the facility.

(n) Require employees to self-report to plant leaders as soon as possible after developing symptoms of COVID-19.

(o) Shut areas of the manufacturing facility for cleaning and disinfection, as necessary, if an employee goes home because he or she is displaying symptoms of COVID-19.

5. Research laboratories, other than laboratories that perform diagnostic testing, must:

(a) Assign dedicated entry point(s) or times into lab buildings.

(b) Conduct a daily entry screening protocol for employees, contractors, suppliers, and any other individuals entering a worksite, including a questionnaire covering symptoms and suspected or confirmed exposure to people with possible COVID-19, together with, if possible, a temperature screening.

(c) Create protocols or checklists as necessary to conform to the facility's COVID-19 preparedness and response plan.

(d) Suspend all non-essential visitors.

(e) Establish and implement a plan for distributing face coverings.

(f) Limit the number of people per square feet of floor space permitted in a particular laboratory at one time.

(g) Close open workspaces, cafeterias, and conference rooms.

(h) As necessary, use tape on the floor to demarcate socially distanced workspaces and to create one-way traffic flow.

(i) Require all office and dry lab work to be conducted remotely.

(j) Minimize the use of shared lab equipment and shared lab tools and create protocols for disinfecting lab equipment and lab tools.

(k) Provide disinfecting supplies and require employees to wipe down their work stations at least twice daily.

(l) Implement an audit and compliance procedure to ensure that cleaning criteria are followed.

(m) Establish a clear reporting process for any symptomatic individual or any individual with a confirmed case of COVID-19, including the notification of lab leaders and the maintenance of a central log.

(n) Clean and disinfect the work site when an employee is sent home with symptoms or with a confirmed case of COVID-19.

(o) Send any potentially exposed co-workers home if there is a positive case in the facility.

(p) Restrict all non-essential work travel, including in-person conference events.

6. Retail stores that are open for in-store sales, as well as libraries and museums, must:

(a) Create communications material for customers (e.g., signs or pamphlets) to inform them of changes to store practices and to explain the precautions the store is taking to prevent infection.

(b) Establish lines to regulate entry in accordance with subsection (c) of this section, with markings for patrons to enable them to stand at least six feet apart from one another while waiting. Stores should also explore alternatives to lines, including by allowing customers to wait in their cars for a text message or phone call, to enable social distancing and to accommodate seniors and those with disabilities.

(c) Except in Regions 6 and 8, adhere to the following restrictions:

(1) Stores of less than 50,000 square feet of customer floor space must limit the number of people in the store (including employees) to 25% of the total occupancy limits established by the State Fire Marshal or a local fire marshal.

(2)  Stores of more than 50,000 square feet must:

    (A)  Limit the number of customers in the store at one time (excluding employees) to 4 people per 1,000 square feet of customer floor space.

    (B)  Create at least two hours per week of dedicated shopping time for vulnerable populations, which for purposes of this order are people over 60, pregnant women, and those with chronic conditions such as heart disease, diabetes, and lung disease.

(3)  The director of the Department of Health and Human Services is authorized to issue an emergency order varying the capacity limits described in this subsection as necessary to protect the public health.

(d)  Post signs at store entrances instructing customers of their legal obligation to wear a face covering when inside the store.

(e)  Post signs at store entrances informing customers not to enter if they are or have recently been sick.

(f)  Design spaces and store activities in a manner that encourages employees and customers to maintain six feet of distance from one another.

(g)  Install physical barriers at checkout or other service points that require interaction, including plexiglass barriers, tape markers, or tables, as appropriate.

(h)  Establish an enhanced cleaning and sanitizing protocol for high-touch areas like restrooms, credit-card machines, keypads, counters, shopping carts, and other surfaces.

(i)  Train employees on:

(1)  Appropriate cleaning procedures, including training for cashiers on cleaning between customers.

(2)  How to manage symptomatic customers upon entry or in the store.

(j)  Notify employees if the employer learns that an individual (including a customer or supplier) with a confirmed case of COVID-19 has visited the store.

(k)  Limit staffing to the minimum number necessary to operate.

7.  Offices must:

(a)  Assign dedicated entry point(s) for all employees to reduce congestion at the main entrance.

9

   (b) Provide visual indicators of appropriate spacing for employees outside the building in case of congestion.

   (c) Take steps to reduce entry congestion and to ensure the effectiveness of screening (e.g., by staggering start times, adopting a rotational schedule in only half of employees are in the office at a particular time).

   (d) Increase distancing between employees by spreading out workspaces, staggering workspace usage, restricting non-essential common space (e.g., cafeterias), providing visual cues to guide movement and activity (e.g., restricting elevator capacity with markings).

   (e) Prohibit social gatherings and meetings that do not allow for social distancing or that create unnecessary movement through the office. Use virtual meetings whenever possible.

   (f) Provide disinfecting supplies and require employees wipe down their work stations at least twice daily.

   (g) Post signs about the importance of personal hygiene.

   (h) Disinfect high-touch surfaces in offices (e.g., whiteboard markers, restrooms, handles) and minimize shared items when possible (e.g., pens, remotes, whiteboards).

   (i) Institute cleaning and communications protocols when employees are sent home with symptoms.

   (j) Notify employees if the employer learns that an individual (including a customer, supplier, or visitor) with a confirmed case of COVID-19 has visited the office.

   (k) Suspend all non-essential visitors.

   (l) Restrict all non-essential travel, including in-person conference events.

8. Restaurants and bars must:

   (a) Limit capacity to 50% of normal seating.

   (b) Require six feet of separation between parties or groups at different tables or bar tops (e.g., spread tables out, use every other table, remove or put up chairs or barstools that are not in use).

   (c) Require patrons to wear a face covering except when seated at their table or bar top (unless the patron is unable medically to tolerate a face covering).

   (d) Require patrons to remain seated at their tables or bar tops, except to enter or exit the premises, to order food, or to use the restroom.

(e) Sell alcoholic beverages only via table service, not via orders at the bar except to patrons seated at the bar.

(f) Prohibit access to common areas in which people can congregate, dance, or otherwise mingle.

(g) Create communications material for customers (e.g., signs, pamphlets) to inform them of changes to restaurant or bar practices and to explain the precautions that are being taken to prevent infection.

(h) Close waiting areas and ask customers to wait in cars whenever possible, or else outside the restaurant or bar, for a notification when their table is ready. Restaurants and bars should take measures to encourage social distancing among those customers waiting for tables who are not waiting in their cars.

(i) Close self-serve food or drink options, such as buffets, salad bars, and drink stations.

(j) Provide physical guides, such as tape on floors or sidewalks and signage on walls to ensure that customers remain at least six feet apart in any lines.

(k) Post signs at store entrances informing customers not to enter if they are or have recently been sick.

(l) Post signs instructing customers to wear face coverings until they are seated at their table.

(m) Require hosts, servers, and staff to wear face coverings in the dining area.

(n) Require employees to wear face coverings and gloves in the kitchen area when handling food, consistent with guidelines from the Food and Drug Administration ("FDA").

(o) Limit shared items for customers (e.g., condiments, menus) and clean high-contact areas after each customer (e.g., tables, chairs, menus, payment tools).

(p) Train employees on:

(1) Appropriate use of personal protective equipment in conjunction with food safety guidelines.

(2) Food safety health protocols (e.g., cleaning between customers, especially shared condiments).

(3) How to manage symptomatic customers upon entry or in the restaurant.

(q) Notify employees if the employer learns that an individual (including an employee, customer, or supplier) with a confirmed case of COVID-19 has visited the store.

(r) Close restaurant immediately if an employee shows symptoms of COVID-19, defined as either the new onset of cough or new onset of chest tightness or two of the following: fever (measured or subjective), chills, myalgia, headache, sore throat, or disorders of taste or smell, and perform a deep clean, consistent with guidance from the FDA and the CDC. Such cleaning may occur overnight.

(s) Install physical barriers, such as sneeze guards and partitions at cash registers, bars, host stands, and other areas where maintaining physical distance of six feet is difficult.

(t) To the maximum extent possible, limit the number of employees in shared spaces, including kitchens, host stands, break rooms, and offices, to maintain at least a six-foot distance between employees.

9. Outpatient health-care facilities, including clinics, primary care physician offices, or dental offices, and also including veterinary clinics, must:

(a) Post signs at entrance(s) instructing patients to wear a face covering when inside.

(b) Limit waiting-area occupancy to the number of individuals who can be present while staying six feet away from one another and ask patients, if possible, to wait in cars for their appointment to be called.

(c) Mark waiting rooms to enable six feet of social distancing (e.g., by placing X's on the ground and/or removing seats in the waiting room).

(d) Enable contactless sign-in (e.g., sign in on phone app) as soon as practicable.

(e) Add special hours for highly vulnerable patients, including the elderly and those with chronic conditions.

(f) Conduct a common screening protocol for all patients, including a temperature check and questions about COVID-19 symptoms.

(g) Place hand sanitizer and face coverings at patient entrances.

(h) Require employees to make proper use of personal protective equipment in accordance with guidance from the CDC and OSHA.

(i) Require patients to wear a face covering when in the facility, except as necessary for identification or to facilitate an examination or procedure.

(j) Install physical barriers at sign-in, temperature screening, or other service points that normally require personal interaction (e.g., plexiglass, cardboard, tables).

(k) Employ telehealth and telemedicine to the greatest extent possible.

(l) Limit the number of appointments to maintain social distancing and allow adequate time between appointments for cleaning.

(m) Employ specialized procedures for patients with high temperatures or respiratory symptoms (e.g., special entrances, having them wait in their car) to avoid exposing other patients in the waiting room.

(n) Deep clean examination rooms after patients with respiratory symptoms and clean rooms between all patients.

(o) Establish procedures for building disinfection in accordance with CDC guidance if it is suspected that an employee or patient has COVID-19 or if there is a confirmed case.

10. All businesses or operations that provide in-home services, including cleaners, repair persons, painters, and the like, must:

(a) Require their employees (or, if a sole-owned business, the business owner) to perform a daily health screening prior to going to the job site.

(b) Maintain accurate appointment record, including date and time of service, name of client, and contact information, to aid with contact tracing.

(c) Limit direct interaction with customers by using electronic means of communication whenever possible.

(d) Prior to entering the home, inquire with the customer whether anyone in the household has been diagnosed with COVID-19, is experiencing symptoms of COVID-19, or has had close contact with someone who has been diagnosed with COVID-19. If so, the business or operation must reschedule for a different time.

(e) Limit the number of employees inside a home to the minimum number necessary to perform the work in a timely fashion.

(f) Gloves should be worn when practical and disposed of in accordance with guidance from the CDC.

11. All businesses or operations that provide barbering, cosmetology services, body art services (including tattooing and body piercing), tanning services, massage services, or similar personal-care services must:

(a) Maintain accurate appointment and walk-in records, including date and time of service, name of client, and contact information, to aid with contact tracing.

(b) Post signs at store entrances informing customers not to enter if they are or have recently been sick.

(c)  Restrict entry to customers, to a caregiver of those customers, or to the minor dependents of those customers.

(d)  Require in-use workstations to be separated by at least six feet from one another and, if feasible, separate workstations with physical barriers (e.g., plexiglass, strip curtains).

(e)  Limit waiting-area occupancy to the number of individuals who can be present while staying six feet away from one another and ask customers, if possible, to wait in cars for their appointment to be called.

(f)  Discontinue all self-service refreshments.

(g)  Discard magazines in waiting areas and other non-essential, shared items that cannot be disinfected.

(h)  Mark waiting areas to enable six feet of social distancing (e.g., by placing X's on the ground and/or removing seats in the waiting room).

(i)  Require employees to make proper use of personal protective equipment in accordance with guidance from the CDC and OSHA.

(j)  Require employees and customers to wear a face covering at all times, except that customers may temporarily remove a face covering when receiving a service that requires its removal. During services that require a customer to remove their face covering, an employee must wear a face shield or goggles in addition to the face covering.

(k)  Install physical barriers, such as sneeze guards and partitions at cash registers, where maintaining physical distance of six feet is difficult.

(l)  Cooperate with the local public health department if a confirmed case of COVID-19 is identified in the facility.

12.  Sports and entertainment facilities, including arenas, cinemas, concert halls, performance venues, sporting venues, stadiums and theaters, as well as places of public amusement, such as amusement parks, arcades, bingo halls, bowling alleys, night clubs, skating rinks, and trampoline parks, must:

(a)  Post signs outside of entrances informing customers not to enter if they are or have recently been sick.

(b)  Encourage or require patrons to wear face coverings.

(c)  Establish crowd-limiting measures to meter the flow of patrons (e.g., digital queuing, delineated waiting areas, parking instructions, social distance markings on ground or cones to designate social distancing, etc.).

(d) Use physical dividers, marked floors, signs, and other physical and visual cues to maintain six feet of distance between persons.

(e) Limit seating occupancy to the extent necessary to enable patrons not of the same household to maintain six feet of distance from others (e.g., stagger group seating upon reservation, close off every other row, etc.).

(f) For sports and entertainment facilities, establish safe exit procedures for patrons (e.g., dismiss groups based on ticket number, row, etc.).

(g) For sports and entertainment facilities, to the extent feasible, adopt specified entry and exit times for vulnerable populations, as well as specified entrances and exits.

(h) Train employees who interact with patrons (e.g., ushers) on how to:

   (1) Monitor and enforce compliance with the facility's COVID-19 protocols.

   (2) Help patrons who become symptomatic.

(i) Frequently disinfect high-touch surfaces during events or, as necessary, throughout the day.

(j) Disinfect and deep clean the facility after each event or, as necessary, throughout the day.

(k) Close self-serve food or drink options, such as buffets, salad bars, and drink stations.

13. Gymnasiums, fitness centers, recreation centers, exercise facilities, exercise studios, and like facilities must:

(a) Post signs outside of entrances instructing individuals not to enter if they are or have recently been sick.

(b) Maintain accurate records, including date and time of event, names of attendees, and contact information, to aid with contact tracing.

(c) To the extent feasible, configure workout stations or implement protocols to enable ten feet of distance between individuals during exercise sessions (or six feet of distance with barriers).

(d) Reduce class sizes, as necessary, to enable at least six feet of separation between individuals.

(e) Provide equipment-cleaning products throughout the gym or exercise facility for use on equipment.

15

(f) Make hand sanitizer, disinfecting wipes, soap and water, or similar disinfectant readily available.

(g) Regularly disinfect exercise equipment, including immediately after use. If patrons are expected to disinfect, post signs encouraging patrons to disinfect equipment.

(h) Ensure that ventilation systems operate properly.

(i) Increase introduction and circulation of outdoor air as much as possible by opening windows and doors, using fans, or other methods.

(j) Regularly clean and disinfect public areas, locker rooms, and restrooms.

(k) Close steam rooms and saunas.

14. Meat and poultry processing plants must:

(a) Conduct a daily entry screening protocol for employees, contractors, suppliers, and any other individuals entering the facility, including a questionnaire covering symptoms and suspected or confirmed exposure to people with possible COVID-19, together with temperature screening.

(b) Create at least one dedicated entry point at every facility for daily screening as provided in subsection (a) of this section, and ensure physical barriers are in place to prevent anyone from bypassing the screening.

(c) Configure communal work environments so that employees are spaced at least six feet apart in all directions (e.g., side-to-side and when facing one another).

(d) Require employees to wear a face covering whenever present at the facility, except when removal is necessary to eat or drink.

(e) Provide clean cloth face coverings or disposable mask options for employees to use when the coverings become wet, soiled, or otherwise visibly contaminated over the course of a workday.

(f) Use face shields in addition to face coverings as necessary when engineering and administrative controls are difficult to maintain and there may be exposure to other workplace hazards, such as splashes or sprays of liquids on processing lines

(g) Install physical barriers, such as strip curtains, plexiglass, or other impermeable dividers or partitions, to separate meat and poultry processing employees from each other.

(h) Take measures to ensure adequate ventilation in work areas to help minimize employees' potential exposures.

16

(i) Encourage single-file movement with a six-foot distance between each employee through the facility.

(j) Stagger employees' arrival, departure, break, and lunch times to avoid congregations of employees in parking areas, locker rooms, lunch areas, and near time clocks.

(k) Provide visual cues (e.g., floor markings, signs) as a reminder to employees to maintain social distancing.

(l) Designate employees to monitor and facilitate social distancing on the processing floor.

(m) Reduce processing capacity or modify the processing or production lines or stagger workers across shifts to minimize the number of employees in the facility at any one time.

(n) Adopt sick leave policies that discourage employees from entering the workplace while sick and modify any incentive programs that penalize employees for taking sick leave.

(o) Group employees together in cohorts, if feasible, in a manner that allows a group of employees to be assigned to the same shifts with the same coworkers, so as to minimize contacts between employees in each cohort.

(p) If an employee becomes or reports being sick, disinfect the workstation used and any tools handled by the employee.

(q) Provide personal protective equipment that is disposable if possible or else, if reusable equipment is provided, ensure proper disinfection and storage in a clean location when not in use.

15. Casinos must:

(a) Conduct a daily entry screening protocol for customers, employees, contractors, suppliers, and any other individuals entering the facility, including a questionnaire covering symptoms and suspected or confirmed exposure to people with possible COVID-19, together with temperature screening.

(b) Limit and enforce patron occupancy of 15% of total occupancy limits established by the State Fire Marshal or a local fire marshal.

(c) Designate entry points and exit points with extensive signage of the directional flow of patrons.

(d) Place signs at each entrance point, cage, and throughout the casino reminding patrons of CDC guidelines for social distancing practices, proper washing of hands, wearing face coverings, and to stay at home if feeling ill or sick.

(e) Require patrons to wear a face covering, except while eating or drinking or for identification purposes.

(f) Prohibit smoking indoors.

(g) Designate a Liaison Officer (or Officers), identify such Officer (or Officers) to all casino employees, and require any employee who believes they may have contracted COVID-19 or been exposed to COVID-19 to report this to an Officer.

(h) Stagger break schedules and employee starting and ending times to the extent possible to avoid congregation of individuals in back-of-house areas.

(i) Provide frequent opportunities for employees to wash and/or sanitize their hands to reduce the risk of surface transmission.

(j) In addition to the cleaning required under subsection 1(k), clean and disinfect all high-touch objects that are accessible to the public (e.g., ATMs, counters, door handles, elevator panels and buttons, restrooms, dining tables, employee break rooms, carts, chairs, table rails, trash bins, light switches, phones, kiosks, time clocks, etc.).

(k) Provide disinfecting wipes (to the extent they are available) throughout the casino to enable patrons to disinfect frequently touched surfaces.

(l) Place hand sanitizer stations in high traffic areas, including throughout the casino floor and employee break rooms.

(m) Regularly maintain their HVAC systems and maximize the delivery of fresh air into the facility.

(n) Frequently disinfect slot machines, provide wipe dispensaries for slot machines, and post signs encouraging patrons to wipe down slot machines before and after use.

(o) Enable social distancing between slot machines by either:

   (1) Installing a plexiglass barrier between slot machines.

   (2) Disabling machines or removing chairs from machines as necessary to maintain six feet of distance between machines in operation.

(p) Require dealers and customers to wear face coverings.

(q) Require casino employees who provide food and drink service on the casino floor to follow the rules described in section 8, which governs servers at restaurants, including but not limited to, the wearing of face coverings.

(r) Close the following services or offerings:

18

      (1)  Concerts, nightclubs, live events, and shows.

      (2)  Valet service.

      (3)  Coat check.

      (4)  Self-serve buffets and self-serve soda and coffee stations.

  (s)  Follow any infection-control guidance provided by the Michigan Gaming Control Board, including, but not limited to, any guidance on the conduct of table games.

16. Racetracks licensed by the Executive Director of the Michigan Gaming Control Board must follow all orders issued by the Executive Director for reopening and operation consistent with this order or any order that follows from it.

17. Employers must maintain a record of the requirements set forth in subsections 1(c) (training), (d) (screening protocol), and (k) (required notifications).

18. This order is effective immediately upon issuance. Executive Order 2020-145 is rescinded.

19. Nothing in this order shall be taken to limit or affect any rights or remedies otherwise available under law.

20. Consistent with MCL 10.33 and MCL 30.405(3), a willful violation of this order is a misdemeanor.

Given under my hand and the Great Seal of the State of Michigan.

Date:  July 29, 2020

Time:  5:33 pm

                _____

                GRETCHEN WHITMER
                GOVERNOR

By the Governor:

                _____

                SECRETARY OF STATE